UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br>                            **Plaintiffs,** <br><br>     -against- <br><br> COOL MED SUPPLY INC, ORIT DAVIDOV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, <br><br>                            **Defendants.** | CIVIL ACTION <br><br> 24-CV-1827 <br><br> COMPLAINT <br><br> (TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Cool Med Supply Inc ("Cool Med"), Orit Davidov ("Davidov") (Cool Med and Davidov are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1. From at least November 2019 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2. This action seeks to recover more than $165,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for rental pain management durable medical equipment ("DME") devices, in particular Squid Cold Compression Systems (hereinafter "Cold Compression Devices") and Pain Shield MD portable ultrasound ("Portable Ultrasound") units (collectively "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their

homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools and compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every piece of Rental DME supplied by Cool Med was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Defendant Davidov, through Cool Med, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

> (i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating and/or falsifying DME prescriptions by:

    (a) utilizing blank template prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME; and/or

    (b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME; and/or

(iii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone.

6.    The use of generic and/or formulaic descriptions in the fraudulent template prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.    Pursuant to the fraudulent prescriptions, Cool Med routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.    On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.    In many instances, Davidov submitted to Plaintiffs, through Cool Med, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to

misrepresent the quality and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     After obtaining the fraudulent prescriptions from the No-fault Clinics Davidov, through Cool Med, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

11.     In carrying out the scheme to defraud, Defendants stole in excess of $165,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

12.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that were never provided, not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in

the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14.     Defendant Cool Med is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Cool Med accepted assignments of benefits from Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Cool Med submitted its claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Cool Med contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any material y false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

17.     At all relevant times mentioned herein, Cool Med identified the Rental DME it purported provided to Covered Persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers

for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

18.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

19.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

20.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

21.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

22.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

23.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq*.), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

24.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

25.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

26.     In view of the adoption by the WCB of the Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

27.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided to Covered Persons, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, for Non-Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

28.     At all relevant times mentioned herein, under the Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

29.     Under the Fee Schedule, the maximum total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

30.     For DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental

is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

31.     Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

32.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which were to become effective June 7, 2021, with the result that the Medicaid DME fee schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard, on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

33.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

34.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the

"full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

35.      At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Davidov, through Cool Med, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME and accompanying accessories provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME and accompanying accessories.  To the extent the Rental DME and accompanying accessories were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

36.      On information and belief, in furtherance of the scheme to defraud alleged herein, Cool Med as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental DME that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

37.      As part of a fraudulent protocol of treatment, in addition to receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces from other DME retailers, Cool Med purportedly provided to the Covered Persons expensive rental pain management DME and/or compression devices that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In most cases, the Covered Persons purportedly received a Portable Ultrasound Unit from Cool Med.  Depending on the location of the No-fault Clinic, Cool Med,

or another DME retailer would also purportedly provide each Covered Person a Cold Compression Device.  In some cases No-fault insurers in general, and Plaintiffs in particular, would receive bills ranging upwards of $7,000.00 in total cost for the items, as part of the scheme to financially enrich Cool Med, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

38.     On information and belief, Cool Med was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

39.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

40.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity.  Every facet of Defendants' operations, from securing fraudulent prescriptions for Rental DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

41.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for Rental DME.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Cool Med's No-fault claims because Davidov, through Cool Med, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME and accompanying accessories to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for Rental DME accompanying accessories that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.  Such claims continue to be or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

42.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of the in excess of $421,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

43.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

44.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for Rental DME and accompanying accessories they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

45.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Cool Med's unpaid No-fault claims because:

i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

46.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $165,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

**A.      Plaintiffs**

47.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

48.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

51.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.     The Individual Defendant**

52.     Orit Davidov ("Davidov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Defendant Cool Med, and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.     The Retailer Defendant**

53.     Cool Med Supply Inc ("Cool Med") was formed on or about November 13, 2019, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 147-66 77th Avenue, Flushing, New York 11367.  Cool Med is operated, managed, and/or controlled by Defendant Davidov and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME and accompanying accessories under the No-fault Law.

**D.**     **The John Doe Defendants**

54.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.**     **The ABC Corporations**

55.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

56.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

57.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

58.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

59.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

60.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

### FACTUAL BACKGROUND AND ALLEGATIONS
### APPLICABLE TO ALL CAUSES OF ACTION

61.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

62.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

63.     Cool Med is ostensibly a DME supply companies that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Cool Med accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

64.     To process and verify the claims submitted by Cool Med, Plaintiffs required, and Cool Med submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which Cool Med was seeking reimbursement from Plaintiffs.

65.     In nearly all instances, the prescriptions submitted in support of Cool Med's claims for reimbursement were fraudulent, fabricated, duplicated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

66.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Cool Med made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The Rental DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the Rental DME and all included services that was provided to the Covered Person; and

- The fee sought for the billed for Rental DME and accompanying accessories did not exceed that permissible under the No-fault law and regulations.

67.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Cool Med's claims within 30 days of receipt of proof of claim.

68.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Cool Med in support of its claims, and paid Cool Med based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

69.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

70.     At all relevant times mentioned herein, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021).

71.     At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non- Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

    (1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

    (2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

72.     At all relevant times mentioned herein, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

73.     Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

74. At all relevant times mentioned herein, the maximum total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

75. At all relevant times mentioned herein, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Employees Insurance Company v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019).

76. The Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which were to become effective June 7, 2021, with the result that the Medicaid DME fee schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until April 4, 2022.

77. Cool Med was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME and accompanying accessories that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and/or orthotic devices.

78. The Rental DME that Cool Med purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Davidov, through Cool Med, created a billing apparatus which implemented a portion of a pre-determined treatment protocol that was designed to drain the

maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

79.     Davidov created and controlled Cool Med, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME, DME, and/or orthotic devices.   The components of the enterprise followed practices that were part of a racketeering scheme dictated by Davidov, including, but not limited to, one of more of the following practices:

- Unlike legitimate retail DME companies, Davidov, through Cool Med, misrepresented the nature, quality, and cost of Rental DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, submitted bills to Plaintiffs for Rental DME that were never provided to Covered Persons;

  Unlike legitimate retail DME companies, Davidov, through Cool Med, misrepresented the wholesale costs and/or usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, submitted prescriptions and bills to Plaintiffs for Rental DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, submitted prescriptions to Plaintiffs for Rental DME that were no more than pre-printed template forms containing boilerplate language to conceal the lack of medical necessity for the items;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Davidov, through Cool Med, arranged to have prescriptions for Rental DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Davidov, through Cool Med, entered into illicit relationships with one or more No-fault Clinics, which, in exchange for kickbacks and/or a fee, provided Cool Med with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

80. In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

81. The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Davidov engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical Rental DME to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Cool Med, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

82. At all relevant times mentioned herein, Davidov knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME and accompanying accessories.

83.     At all relevant times mentioned herein, Davidov, through Cool Med, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

84.     At all relevant times mentioned herein, Davidov and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

**THE MECHANICS OF THE SCHEME TO DEFRAUD**

85.     Beginning in November 2019, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of compression devices, sustained acoustic medicine machines, and/or orthotic devices to Covered Persons.

86.     Davidov formed, owned and/or controlled Cool Med for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

87.     Cool Med, through Davidov, engaged in a pervasive scheme to defraud, wherein Davidov: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered or duplicated; (iv) arranged for the No-fault Clinics to have assignments of benefits forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to

insurers, in general, and Plaintiffs, in particular, for Rental DME and accompanying accessories that were purportedly provided to Covered Persons based on medical necessity when, in fact, Davidov, through Cool Med, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME and/or orthotic devices for a substantially similar timeframe.

88.   Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

89.   Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for DME.

90.   Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

91.   As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics

arranged for the fraudulent prescriptions to be issued to Cool Med by: (i) causing their HCPs to write Rental DME prescriptions in accordance with a pre-determined protocol; and/or (ii) fabricating and/or falsifying Rental DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms. By way of example and not limitation, Exhibit "3" in the attached Compendium of Exhibits is a representative sample of prescription forms submitted by the Retail Defendants wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied.

92.     Moreover, in keeping with the fact that the Rental DME was not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the HCPs were issued on template, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device.  There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person. The prescription forms contained in Exhibit "4" are also a representative sample of prescriptions with the identical, boilerplate language.

93.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME.  Instead, these prescriptions were given directly to Cool Med to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of Rental DME.

94.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete

24

and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

95.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, Cool Med routinely deliberately obscured identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

96.     As a matter of pattern, practice, and protocol, Cool Med routinely provided Covered Persons with expensive Cold Compression Devices and/or Portable Ultrasound Units that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

97.      In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where ethe Covered Persons were treated.  To the extent that any of the medical records did identify the Rental DME purportedly prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the Rental DME listed on the prescriptions, and in some instances, identified Rental DME that was not included on the prescriptions issued by the HCPs.  On many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were issued on dates that the Covered Persons did not treat with the HCPs. In addition, on many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were left undated, obscuring when the prescription was issued and when legitimately prescribed DME would have been noted in the prescribing HCP's treatment notes.  By way of example and not limitation:

- On November 14, 2019 Covered Person C.H., claim no. 0569028319-02 was purportedly seen by the HCP, for an initial examination at a No-fault

25

Clinic located at 1975 Linden Boulevard, Suite 111, Elmont, NY, and thereafter on a re-evaluation on December 24, 2019, yet neither the initial examination report nor the re-evaluation report made any prescription or recommendation for rental DME.  Notwithstanding, Cool Med submitted bills with a prescription dated November 14, 2019, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| G.P. | 11/22/2019-12/19/2019 | Ultrasound Therapy System | E1399 | $706.72 |
| | 11/22/2019; 12/6/2019 | Ultrasound System PS Patches | A9999 | $3,134.46 |

- October 22, 2020, Covered Person C.G., claim no. 0601385842-10 was purportedly seen by the HCP, for an initial examination at a No-fault Clinic located at 332 E 149 Street, 2nd Floor, Bronx, NY, yet the initial examination report made no mention of prescription or recommendation for rental DME; rather, it contained illegible scribble for purported home exercise therapeutic equipment.  Notwithstanding, Cool Med submitted bills with a prescription dated October 22, 2020, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| G.P. | 11/9/2020-12/6/2020 | Ultrasound Therapy System | K1004 | $706.72 |
| | 11/9/2020; 11/23/2020 | Ultrasound System PS Patches | A9999 | $3,134.46 |

- On January 6, Covered Person K.M., claim no. 0610565574-01 was purportedly seen for an initial examination at a No-fault Clinic located at 4014 A Boston Road, Bronx, NY, and thereafter a follow-up examination on February 10, 2021, yet, neither the initial examination report, nor the follow-up exam report made mention of any prescription or recommendation for rental DME; rather, it contained illegible scribble for purported home exercise therapeutic equipment.  Notwithstanding, Cool Med submitted bills with an undated prescription, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| M.C. | 1/14/2021-2/10/2021 | Ultrasound Therapy System | K1004 | $706.72 |
| | 1/14/2021; 1/28/2021 | Ultrasound System PS Patches | A9999 | $3,134.46 |

- On February 23, 2021, Covered Person J.F., claim no. 0614879732-09, was seen for an initial examination at a No-fault Clinic located at 430 W. Merrick Rd, Valley Stream, NY, and thereafter for a re-evaluations on March 24, 2021 and April 21, 2021, yet, neither the initial examination report nor the re-evaluation reports made mention of any prescription or recommendation for DME and/or orthotic devices.  Notwithstanding, Cool

Med submitted bills with a prescription dated March 24, 2021 purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| C.H. | 3/30/2021-4/26/2021 | Ultrasound Therapy System | K1004 | $706.72 |
| | 3/30/2021; 4/13/2021 | Ultrasound System PS Patches | A9999 | $3,134.46 |
| | 3/30/2021-4/27/2021 | Cold Compression Device | E1399 | $1,954.40 |
| | 3/30/2021-4/26/2021 | L. Shoulder Wrap | E1399 | $420.00 |
| | 3/30/2021-4/26/2021 | Knee Wrap | E1399 | $420.00 |
| | 3/30/2021-4/26/2021 | Back Wrap | E1399 | $420.00 |

98.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

99.     In furtherance of the scheme to defraud alleged herein, Cool Med, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

100.     As part of the scheme, the Covered Persons receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices—in some instances, receiving up to ten (10) or more items.

101.    At the same time and/or shortly after Covered Persons purportedly receive several pieces of DME and/or orthotic devices, as part of the fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME and/or compression devices by the HCPs operating out of the No-fault Clinics, including but not limited to a Portable Ultrasound units billed for and purportedly dispensed by Defendant Cool Med, and a Cold Compression Device, billed for and purportedly dispensed by Cool Med or another DME retailer.

102.    In sum, Covered Persons purportedly receiving expensive Rental DME from Cool Med, often receive more than ten (10) standard DME and/or orthotic devices and pain management rental DME, all prescribed by the same HCP, in some cases exceeding $10,000.00 in total costs for the items. By way of example but not limitation :

- In connection with claims submitted on behalf of Covered Person D.S., claim number 0613121839-04, Plaintiffs were billed for at least thirteen pieces of regular DME totaling $3,739.36, all prescribed by the same HCP. On February 15, 2021, to fill a prescription dated January 26, 2021, AMA Supply (not named a defendant in the Complaint) purportedly provided a lumbar cushion for $282.40, an LSO for $283.76, a bed board for $157.21, a foam mattress for $187.08, a cervical collar for $233.00, and a cervical pillow for $22.04. On March 4, 2023, AMA Supply also purportedly provided a massager for $164.00, an EMS unit for $612.99, an EMS placement belt for $76.25, a thermophore for $20.93, and an infrared heating lamp for $156.00. On May 20, 2021, Medicorum Supplies (not named a defendant in the Complaint) purportedly provided a cervical traction unit for $502.63, and the second LSO the Covered Person purportedly received, for $1,041.07. In addition, contemporaneously with the Covered Person's purported receipt of the aforementioned regular DME, Plaintiffs were billed for at least six pieces of pain management rental DME and accompanying accessories totaling $8,612.18, prescribed by the same HCP.  Starting January 28, 2021, RK Med Inc (not named a defendant in the Complaint) purportedly provided a Pain Away Laser system for a forty-three-day rental period, for the total amount of $2,881.00.  Starting February 14, 2021, to fill a prescription by the HCP dated January 26, 2021, Defendant Cool Med purportedly provided a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement coupling patches for $3,134.46, for the total

amount of $3,841.18. Starting the same day, Peaceful Health Supplies Inc (not named a defendant in the Complaint) purportedly provided a Game Ready Portable Cold Compression device for a twenty-one-day rental period for $1,470.00, and cervical and lumbar compression wraps, each for twenty-one-day rental periods, for $210.00, each, for the total amount of $1,890.00. Ultimately, Plaintiffs were billed for $12,351.53 in connection with at least nineteen pieces of DME all prescribed by a single HCP.

- In connection with claims submitted on behalf of Covered Person F.C., claim number 0626739502-01, Plaintiffs were billed for at least fourteen pieces of regular DME totaling $7,489.28, all prescribed by the same HCP. On June 15, 2021, Medicorum Supplies (not named a defendant in the Complaint) purportedly provided a lumbar cushion for $309.97, an LSO for $322.98, a bed board for $159.61, a foam mattress for $160.18, a cervical collar for $322.50, a cervical pillow for $22.04, a massager for $268.42, an EMS unit for $660.52, an EMS belt for $231.94, and an infrared heat lamp for $296.27. On July 10, 2021, Korge Products Corp. (not named a defendant in the Complaint) purportedly provided two shoulder orthoses for $991.11, each, a cervical traction unit for $502.63, the second LSO that the Covered Person purportedly received, for $1150.00, and an ankle orthosis for $1,100.00. In addition, contemporaneously with the Covered Person's purported receipt of the aforementioned regular DME, Defendant Cool Med purportedly provided a Cold Compression Device, for a twenty-eight-day rental period, for $1,954.40, with two accompanying wraps for twenty-eight day rental periods for $840.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement coupling patches for $3,134.46, for the total amount of $6,635.58. Ultimately, Plaintiffs were billed for $14,124.86 in connection with at least nineteen pieces of DME all prescribed by a single HCP.

- In connection with claims submitted on behalf of Covered Person C.G., claim number 0601385842-10, Plaintiffs were billed for at least fourteen pieces of regular DME totaling $4,630.57, all prescribed by the same HCP. On November 10, 2020, AMA Supply (not named a defendant in the complaint) purportedly provided lumbar cushion for $282.40, an LSO for $283.76, a bed board for $157.21, a foam mattress for $155.52, a cervical collar for $75.00, and a cervical pillow for $22.04. On December 21, 2020, AMA Supply also purportedly provided a massager for $164.00, an EMS unit for $448.05, an EMS placement belt for $231.94, a thermophore for $20.93, and an infrared heating lamp for $156.00. on December 30, 2020, AMA Supply also purportedly provided a cervical traction unit for $502.63. On January 21, 2021, AMA Supply also purportedly provided the second LSO it purportedly provided to the Covered Person, for $844.13. On January 29, 2021, AMA Supply also provided a shoulder orthosis for $1,286.96. In addition, contemporaneously with the Covered Person's purported receipt of the aforementioned regular DME, Plaintiffs were billed for at least five pieces of pain management rental DME and accompanying

accessories totaling $6,361.18, prescribed by the same HCP.  Starting November 9, 2020, Cool Med purportedly provided a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement coupling patches for $3,134.46, for the total amount of $3,841.18. Starting the same day, Peaceful Health Supplies Inc (not named a defendant in the Complaint) purportedly provided a Game Ready Portable Cold Compression device for a twenty-eight-day rental period for $1,960, and shoulder and lumbar compression wraps, each for twenty-eight-day rental periods, for $280.00, each, for the total amount of $2,52000. Ultimately, Plaintiffs were billed for $10,991.75 in connection with at least nineteen pieces of DME all prescribed by a single HCP.

103.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants.  In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

**1**.    **Fraudulent billing for Cold Compression Devices**

104.    In furtherance of the scheme to defraud alleged herein, Davidov, through Cool Med, routinely submitted bills to Plaintiffs for Squid Cold Compression Systems ("Cold Compression Devices") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

105.    Each of the Covered Persons that receive Cold Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0614879732-09, 0602815649-02, 0614806313-02, 0614955938-03, and 0597509298-04, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

106.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME.  As part of the aforementioned treatment protocol, at the same time asor a short time after Covered Persons are prescribed basic DME, Covered Persons are also prescribed the Cold Compression Devices on a rental basis for the purposes of pain management that Defendants purportedly provided to Covered Persons.

107.    A compression device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. A Cold Compression Device, which was billed for by Defendants, operates similarly but simultaneously applies cold therapy to the affected area of the patient.

108.    A Cold Compression Device is typically used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

109.    The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated.

110.    However, the Cold Compression Devices purportedly dispensed by Cool Med were not dispensed following a surgery to prevent a DVT, but were purportedly provided for

pain management and/or to reduce swelling and inflammation related to soft-tissue injuries caused by a motor vehicle accident.

111.    On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident when the patient is able to use an ice pack and compression bandage to address swelling and inflammation.

112.    On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident for use more than a week following the accident, long after the period when cold therapy and compression, would decrease swelling from the trauma caused by a low-impact automobile accident.

113.    Notwithstanding the foregoing, the Cold Compression Devices that Cool Med purportedly provided to Covered Persons were prescribed by HCPs for use by Covered Persons a week or more following the date of their low-impact automobile accidents, and on information and belief, to patients who were able to use ice packs and compression bandages to address swelling and inflammation.

114.    The Compression Devices supplied by Cool Med were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

115.    In that regard, Cool Med routinely billed Plaintiffs for Cold Compression devices and accompanying compression wraps under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement Amount.

116.    On information and belief, Cool Med's acquisition cost for the Cold Compression Device without wraps was no more than $600, the amount the Cold Compression Device is available for sale to the general public.

117.    On information and belief, the maximum monthly rental rate that Cool Med was permitted to charge for the rental of Cold Compression devices was thus, no more than $60.

118.    However, Cool Med routinely billed Plaintiffs $1,954.40, for a twenty-eight-day rental for Cold Compression Devices, more than thirty-two (32) times the maximum permissible monthly rental rate for the Cold Compression Devices Cool Med purportedly provided, and more than three times what Cool Med would have been permitted to charge for the sale of the Cold Compression Device.

119.    On information and belief, Cool Med's acquisition cost for back wraps, accessories Cool Med billed Plaintiffs for in connection with the provision of Cold Compression Devices, was no more than $330.00 per wrap, the amount that back wraps are available for sale to the general public.

120.    On information and belief, the maximum monthly rate that Cool Med was permitted to charge for the rental of back wraps was no more than $33.

121.    However, Cool Med routinely billed Plaintiffs $420, for each twenty-eight-day rental for back wraps, which is more than twelve (12) times the maximum permissible monthly rental rate, and more than twenty-five percent (25%) more than what Cool Med would have been permitted to charge for the sale of back wraps.

122.    On information and belief, Cool Med's acquisition cost for shoulder wraps, accessories Cool Med billed Plaintiffs for in connection with the provision of Cold Compression

Devices, was no more than $430.00 per large shoulder wrap, the amount that shoulder wraps are available for sale to the general public.

123.    On information and belief, the maximum monthly rate that Cool Med was permitted to charge for the rental of shoulder wraps was no more than $43.00.

124.    However, Cool Med routinely billed Plaintiffs $420, for each twenty-eight-day rental for shoulder wraps, which is more than nine (9) times the maximum permissible monthly rental rate.

125.    On information and belief, Cool Med's acquisition cost for knee wraps, accessories Cool Med billed Plaintiffs for in connection with the provision of Cold Compression Devices was no more than $370 per large knee wrap, the amount the knee wraps are available for sale to the general public.

126.    On information and belief, the maximum monthly rate that Cool Med was permitted to charge of the rental of knee wraps was no more than $37.

127.    However, Cool Med routinely billed Plaintiffs $420 for each twenty-eight-day rental of knee wraps, which more than eleven (11) times the maximum permissible monthly rate for the knee wraps that Cool Med purportedly provided, and more than twelve percent (12%) more than what Cool Med would have been permitted to charge for the sale of knee wraps.

128.    By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims where Cool Med submitted fraudulent bills to Plaintiffs for Cold Compression Devices billed under code E1399 at a daily rental date of $69.80 for totals upwards of $1,954.40 for a 28 day rental, broken up into eight to ten day increments, and accompanying appliances under codes E1399 at a daily rental rate of

$15.00, for upwards of $420.00 per 28 day rental per appliance, broken up into eight to ten day increments, at times for up to $1,260.00 for the rental of three appliances.

**2.      Fraudulent billing of Portable Ultrasound Units**

129.    In furtherance of the scheme to defraud alleged herein, Davidov, through Cool Med, routinely submitted bills to Plaintiffs for Portable Ultrasound units that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

130.    Each of the Covered Persons that receive Portable Ultrasound Units were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0569028319-02, 0578228868-01, 0578445314-01, 0583023254-02, 0593050941-06, 0593050941-07,    0597509298-04,    0601127616-01,    0602815649-02,    0610565574-01, 0614806313-02, 0614879732-09, and 0614955938-03, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

131.    The Portable Ultrasound units device is a battery powered, wearable and portable device that purports to produce ultrasound in order to provide heat related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two-to-six-week period.

132.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for Portable Ultrasound units for patients that, in many instances, were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, along with a host of other expensive DME, designed to upcharge insurers for tens of thousands of dollars as part of a fraudulent protocol of medically unnecessary treatments. In

that regard, similar to the compression devices described above, at the same time as or immediately prior to the dispensing of the Portable Ultrasound units, the patients receive a substantial and similar battery of regular DME and often other pain management rental DME, pursuant to a fraudulent protocol established by the No-fault Clinics where the Covered Persons presented for treatment.

133.    The heating pattern of the Portable Ultrasound unit is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP.  For example, the ultrasound purportedly provided by the Portable Ultrasound unit only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles.

134.    In keeping with the facts that the Portable Ultrasound units purportedly provided by Cool Med were medically unnecessary, Covered Persons purportedly receiving the devices were, at the same time, undergoing a protocol of physical therapy treatment at the No-fault Clinics, obviating the need for at-home ultrasound therapy.

135.    The prescriptions for the Portable Ultrasound units are never given to the patients. Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined Rental DME provider in exchange for a kickback and/or other financial incentive or compensation.

136.    In numerous cases, the prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the Portable Ultrasound units in particular.

137.     Upon receipt of the prescriptions for the Portable Ultrasound units, Cool Med routinely submits bills to insurers for rental periods of four (4) weeks regardless of actual patient need in order to maximize reimbursement.

138.     Moreover, routinely separated each four-week rental into two bills, each for two weeks of the full rental period, to conceal from insurers the true length and total accumulated rental cost of the billed for Portable Ultrasound units.

139.     On information and belief, oftentimes, the devices are delivered to the patients without the patients' knowledge that they were going to receive the device.  Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to the patients.  In many cases and as a result, the patients do not use the device and/or use the device improperly posing a risk to the patients' health as well rendering the device ineffective.

140.     The Portable Ultrasound unit dispensed by Defendants to the Covered Persons delivers ultrasounds through a single replaceable PS patch at a time.

141.     On each bill for fourteen days of a twenty-eight-day rental period, Cool Med routinely billed Plaintiffs for twenty-one PS patches, more than one for each day's treatment.

142.     Moreover, on information and belief, the PS patches for the Portable Ultrasound unit purportedly dispensed to Plaintiffs are reusable for up to thirty treatments.

143.     Accordingly, Defendants routinely inflated the reimbursements they sought on each bill submitted to Plaintiffs for Portable Ultrasound units by billing for an excessive quantity of PS patches, beyond what would have been medically necessary, to the extent the Portable Ultrasound units are medically necessary at all.

144.     Further, Davidov, through Cool Med, falsely represented that the PS patches were an item that qualified for reimbursement under HCPCS Code A9999, as a means to significantly inflate the reimbursement for what was being provided.

145.     Cool Med billed for the Portable Ultrasound units under HCPCS code K1004, which, at all times relevant herein, is defined as "low frequency ultrasonic diathermy treatment device for home use, includes all proponents and accessories."

146.     Each time Cool Med billed for a Portable Ultrasound unit using HCPCS code K1004, Defendants submitted separate charges for PS patches under Code A9999, an accessory code, notwithstanding that all accessories to the Portable Ultrasound units are covered under Cool Med's use of code K1004.

147.     Although, at all times relevant herein, code K1004 specifically "includes all proponents and accessories," Davidov, through Cool Med, nonetheless fraudulently charged Plaintiffs from $1,044.82 to $3,134.46 per Covered Person for PS patches, in addition to the rental charge of $353.36 to $706.72 for the Portable Ultrasound units, despite the PS patches being accessories included in the rental charge for the Portable Ultrasound units.

148.     By way of example and not limitation, Davidov, through Cool Med, routinely submitted bills to Plaintiffs for Portable Ultrasound units under codes E1399 and/or K1004 in amounts up to and including $706.72, and accompanying PS patches under code A9999, in amounts up to and including $3,134.46, which were not provided as billed, if any were provided at all, and were supplied pursuant to a fraudulent protocol of treatment. Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims submitted through Cool Med to Plaintiffs where Retailer Defendant submitted fraudulent bills for Portable Ultrasound units under code E1399 at a daily rental rate of $25.24, in amounts ranging from

$353.36 to $706.72 per bill, and accompanying PS patches billed under code A9999 at a unit price of $74.63, in amounts ranging from $1,044.82 to $3,134.46 per bill.

149.    Finally, to the extent the Portable Ultrasound devices purportedly provided to Covered Persons on a rental basis, and accompanying PS patches are reimbursable at all, Davidov, through Cool Med billed Plaintiffs far in excess of that permissible under the Fee Schedule.

## DISCOVERY OF THE FRAUD

150.    To induce Plaintiffs to promptly reimburse their claims for Rental DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Davidov, through Cool Med, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Davidov, through Cool Med, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Davidov, through Cool Med, knowingly misrepresented and concealed that Cool Med's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Davidov, through Cool Med, knowingly and deliberately concealed the amounts Cool Med was entitled to be reimbursed in the bills submitted to Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

151.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent

concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $165,000.00 based upon the fraudulent bill submissions.

152.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT DAVIDOV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

153.     The allegations of paragraphs 1 through 152 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

154.     At all times relevant herein, Cool Med Supply Inc was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

155.     From, in or about November 13. 2019, through the date of the filing of this Complaint, Defendants Davidov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Cool Med enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

156.   At all relevant times mentioned herein, Defendant Davidov, together with others unknown to Plaintiff, exerted control over and directed the operations of the Cool Med enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

157.   One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Davidov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims.

158.   It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

159.   The racketeering acts set forth herein were carried out on a continued basis for more than four-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Davidov, one or more of the ABC Corporations 1 through 5, and one or

more of the John Does 1 through 5 to fraudulently bill for Rental DME to defraud insurers, and, if not stopped, such acts will continue into the future.

160.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Cool Med continues to pursue collection on the fraudulent billing to the present day.

161.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Davidov, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Cool Med enterprise based upon materially false and misleading information.

162.    Through the Cool Med enterprise, Defendant Davidov submitted numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Davidov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Davidov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Cool Med enterprise through the filing of this Complaint.

163.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Davidov

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

164.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

165.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

166.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $161,000.00, the exact amount to be determined at trial.

167.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company are entitled to recover from Defendants Davidov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS COOL MED, AND DAVIDOV**

**(Common Law Fraud)**

168.   The allegations of paragraphs 1 through 152 are hereby repeated and realleged as though fully set forth herein.

169.   Defendants Cool Med and Davidov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

170.     Each and every bill and supporting documentation submitted by Defendants Cool Med and Davidov to Plaintiffs set forth false and fraudulent amounts for reimbursement for Rental DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

171.     Defendants Cool Med and Davidov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Cool Med was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; and/or (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME which Defendants knew to be fabricated and/or fraudulently altered or duplicated and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Davidov, through Cool Med, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially

similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Davidov, through Cool Med, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

172.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Cool Med's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

173.   Defendants Cool Med and Davidov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

174.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Cool Med and Davidov.

175.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendants Cool Med's claims for No-fault insurance benefits submitted in connection therewith.

176.   Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Cool Med and Davidov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

177.   By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to

be in excess of $165,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS COOL MED AND DAVIDOV

## (Unjust Enrichment)

178.   The allegations of paragraphs 1 through 152 are hereby repeated and realleged as though fully set forth herein.

179.   By reason of their wrongdoing, Defendants Cool Med and Davidov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

180.   Plaintiffs are therefore entitled to restitution from Defendants Cool Med and Davidov in the amount by which it has been unjustly enriched.

181.   By reason of the foregoing, Plaintiffs and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $165,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST THE RETAIL DEFENANTS

## (Declaratory Judgment under 28 U.S.C. § 2201)

182.   The allegations of paragraphs 1 through 152 are hereby repeated and realleged as though fully set forth herein.

183.     At all relevant times mentioned herein, each and every bill mailed by Davidov, through Cool Med, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME and/or orthotic devices.

184.     To the extent the Rental DME and/or orthotic devices were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

185.     At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

186.     In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills it has submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

187. As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendants' No-fault claims.

188. Plaintiffs have no adequate remedy at law.

189. The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)  Compensatory damages in an amount in excess of $165,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)  Punitive damages in such amount as the Court deems just;

iii)  Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)  Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)      Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)      Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated:  New York, New York,
        March 12, 2024

                                Morrison Mahoney LLP

                                By:   /s/ Lee Pinzow
                                      Robert A. Stern, Esq.
                                      James McKenney, Esq.
                                      Lee Pinzow, Esq.
                                      Attorneys for Plaintiffs
                                      Wall Street Plaza
                                      88 Pine Street, Suite 1900
                                      New York, New York 10005
                                      (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,**<br><br>          **Plaintiffs,**<br><br>  -against-<br><br><br>**COOL MED SUPPLY INC, ORIT DAVIDOV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,**<br><br>         **Defendants.** | **CIVIL ACTION**<br><br>**24-CV-1827**<br><br>**COMPLAINT**<br><br>**(TRIAL BY JURY DEMANDED)** |

# COMPLAINT

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFFS**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**